**THE TRIAL LAW FIRM, LLC**
Mart Harris, Esquire
Pa. Id. No. 319504
412.588.0030 | MH@TLawF.com

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PITTSBURGH DIVISION

| | |
|---|---|
| KENYA HARPER, | Case No. 2:22-cv-836 |
| Plaintiff, | |
| vs. | **COMPLAINT IN CIVIL ACTION** |
| ALLEGHENY COUNTY, PENNSYLVANIA; DR. FNU ANDERSON; NURSE FNU LNU 1; C.O. FNU LNU 1; C.O. FNU LNU 2; NURSE FNU LNU 2, | Fed.R.Civ.P. 38(b)(1) Notice of Demand for Trial by Jury |
| Defendants. | |

## **COMPLAINT**

NOW COMES the Plaintiff, Kenya Harper by and through her lawyers to file the within Complaint in Civil Action, and in support thereof avers that:

**Parties, Jurisdiction, and Venue**

1. The Plaintiff is Kenya Harper ("Ms. Harper"). Ms. Harper is an adult female individual who currently resides in Allegheny County Pennsylvania.

2. The First Defendant is Allegheny County, Pennsylvania ("Allegheny"). Allegheny is a county level government in the Commonwealth of Pennsylvania. Allegheny operates the Allegheny County Jail ("the Jail").

3. The Second Defendant is Doctor FNU Anderson ("Dr. Anderson"). Dr. Anderson is the OBGYN at the Jail.

4. The Third Defendant is Nurse FNU LNU 1 ("Nurse 1"). Nurse 1 is a nurse at the Jail. Nurse 1 will be re-named in an Amended Complaint following initial discovery.

5. The Fourth Defendant is C.O. FNU LNU 1 ("C.O. 1"). C.O. 1 is a corrections officer at the Jail. C.O. 1 will be re-named in an Amended Complaint following initial discovery.

6. The Fifth Defendant is C.O. FNU LNU 2 ("C.O. 2"). C.O. 2 is a corrections officer at the Jail. C.O. 2 will be re-named in an Amended Complaint following initial discovery.

7. The Sixth Defendant is Nurse FNU LNU 2 ("Nurse 2"). Nurse 2 is a nurse at the Jail. Nurse 2 will be re-named in an Amended Complaint following initial discovery.

8. Ms. Harper brings this lawsuit to redress violations of her Fifth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983. Thereby this court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

9. Further, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over related Pennsylvania claims.

10. The events and omissions which give rise to the claims asserted in this lawsuit occurred in the geographical territory of this court, in or around Pittsburgh Pennsylvania. Therefore, pursuant to 28 U.S.C. § 1391(b), this district court is the proper venue for this lawsuit.

11. Upon information and belief, including but not exclusively limited to the fact that all individual Defendants work at the Jail, all Defendants resides Allegheny County, Pennsylvania. Therefore, this court has personal jurisdiction over the Defendants pursuant to Fed.R.Civ.P. 4.

12. Ms. Harper has satisfied all necessary conditions precedent to the filing of this lawsuit.

**Facts**

13. All other paragraphs of this lawsuit are incorporated.

14. On or about November 13, 2020, Ms. Harper discovered that she was pregnant.

15. On or about November 20, 2020, Ms. Harper arrived at the Jail.

16. Ms. Harper was given an initial medical screening upon her arrival at the Jail. During that screening, Ms. Harper informed Allegheny that she was pregnant. The Jail staff chemically confirmed Ms. Harper's pregnancy, and estimated that Ms. Harper had been pregnant for eight (8) weeks.

17. Ms. Harper, in that same initial medical screening, informed Allegheny that her blood type is B negative. Ms. Harper explained that she may need additional medical attention during her pregnancy, because if the baby's blood type is positive, Ms. Harper's body would treat the baby as an infection and self-abort the pregnancy.

18. Ms. Harper, in that same initial medical screening, informed Allegheny that the first time she gave birth, the baby had to stay in the neo-natal intensive care unit. She further informed that during her second pregnancy she suffered from a placental abruption which almost killed the baby. Finally, she informed Allegheny that since she has a family history of Down's Syndrome, she would need a genetic test before the tenth week of pregnancy.

19. The Jail assigned Ms. Harper to the infirmary where she stayed for three days.

20. On or about November 27, 2020, Ms. Harper had her first appointment with Dr. Anderson. During this appointment, Ms. Harper informed Dr. Anderson of her pregnancy issues and concerns, discussed *supra* at ¶¶ 17-18 of this lawsuit.

21. During this appointment, Ms. Harper was able to listen to her baby's heartbeat.

22. On or about December 3, 10, 17, 24, and 31, 2020 Ms. Harper met with Dr. Anderson for a check-up. During each appointment, Dr. Anderson was unable to locate the baby's heartbeat, but assured Ms. Harper that such inability was normal, and that all measurements indicated that the pregnancy was progressing normally.

23. On or about January 4, 2021, Ms. Knight sent Ms. Harper to medical because, from Ms. Knight's perspective, Ms. Harper was not "growing."

24. On or about January 4, 2021, Nurse 1 said that she found the baby's heartbeat and that it was 148 beats per minute. Nurse 1 assured Ms. Harper that it was actually the baby's heartbeat, and not Ms. Harper's own heart and/or pulse.

25. On or about January 7, 2021, at approximately 10:00a.m., Ms. Harper met with Dr. Anderson for a check-up. Ms. Harper informed Dr. Anderson of the events of January 4, 2021 (discussed *supra* at ¶¶ 23-24 of this lawsuit). After this check-up, Ms. Harper left the appointment.

26. On or about January 7, 2021, at approximately 1:00p.m., Ms. Harper was instructed to immediately report to the infirmary.

27. When Ms. Harper arrived at the infirmary, Ms. Harper was informed that she was "going out." Ms. Harper was placed in a room where she was eventually awoken and tested for COVID-19. She remained in the infirmary for the rest of the day, and through the first half of the next day.

28. On or about January 8, 2021 at approximately 1:00p.m., Ms. Harper was detained by the Allegheny County Sheriff who, along with two corrections officers from the Jail, escorted Ms. Harper to West Penn Hospital.

29. Upon arrival at the hospital, Ms. Harper received a sonogram.

30. Ms. Harper asked if the baby was a boy or a girl.

31. The sonogram technician replied, "it is too early to tell."

32. Since Ms. Harper had three previous pregnancies, she knew that being fourteen weeks pregnant and in the second trimester, that it was not too early to tell the sex of the baby.

33. Ms. Harper was left alone in the room (with her escorts).

34. Shortly thereafter, a doctor entered the room.

35. The doctor asked the law enforcement officers to allow Ms. Harper and he privacy for what he had to tell her.

36. Eventually the officers agreed to wait in the hall.

37. Once Ms. Harper was alone with the doctor, the doctor said, "I'm sorry, but you miscarried."

38. Ms. Harper asked the doctor if he was sure.

39. The doctor replied, "yes. I am sure. The baby died at ten weeks." Upon information and belief, including but not exclusively limited to the Jail assessing Ms. Harper to have been eight (8) weeks pregnant on or about November 20, 2020, the Ms. Harper's baby died on or about December 4, 2020.

40. Ms. Harper was confused, because she could see the baby in her stomach on the sonogram. The doctor explained that not all miscarriages immediate result in discharge, and that a procedure would have to be performed to remove the body.

41. Ms. Harper was then discharged from the hospital and taken in a wheelchair back to the vehicle and then driven back to the Jail.

42. Upon arrival at the Jail, Ms. Harper begged to be allowed to keep the sonogram picture, and was eventually allowed to keep it with her in the Jail.

43. Upon information and belief, including but not exclusively limited to the fact that corrections officers were giving Ms. Harper feminine hygiene products, Allegheny was on notice and expected Ms. Harper to discharge the body in the Jail, rather than through the medical procedures available at the hospital.

44. On or about January 12, 2021, Ms. Harper noticed that she was bleeding.

45. She rang the buzzer for help.

46. C.O. 2 asked Ms. Harper "what do you want me to do about it" and thereafter did not take steps to provide Ms. Harper with medical treatment.

47. Later than night, Ms. Harper awoke with horrible abdominal pain.

48. Ms. Harper, believing she had to urinate, did so in the toilet.

49. When she had finished, she noticed the sensation of fluid continuing to exit her body.

50. Ms. Harper turned on the light.

51. Ms. Harper saw that blood was everywhere.

52. She rang the buzzer for help.

53. C.O. 1 answered and asked what was wrong.

54. Ms. Harper replied, "I need a nurse."

55. C.O. 1 asked why.

56. Ms. Harper replied "I am having a miscarriage."

57. C.O. 1 told her to "hang on."

58. Instead of summoning medical assistance, C.O. 1 told her "the only way you can get help is if you walk to the infirmary."

59. Ms. Harper indicated that she did not think she could make it to the infirmary.

60. C.O. 1 said "that's the only way."

61. Ms. Harper felt like she was dying and walked, while bleeding profusely, to the infirmary (which was on a different floor).

62. At the infirmary, Ms. Harper informed Nurse 2 of horrible pain which prevented her from sitting.

63. Blood had completely soaked through Ms. Harper's uniform.

64. Nurse 2 put Ms. Harper in a room by herself, and gave her puppy potty training pads to sit on.

65. Nurse 2 stated that Ms. Harper had to sit because she "was losing too much blood."

66. Despite Nurse 2's observation, she did not summon further medical assistance.

67. Eventually an ambulance was called. When the paramedics arrived, they asked why she wasn't given the procedure yet. Ms. Harper replied that she did not know, and she was subsequently taken to West Penn Hospital's Emergency Room.

68. In the E.R. while a nurse was attempting to get Ms. Harper's vital signs, Ms. Harper began to feel very hot.

69. Suddenly, the body was largely discharged.

70. Hospital staff put the body's remains into small cups, and left them sitting next to Ms. Harper.

71. A doctor later performed an internal sonogram and informed Ms. Harper that the body did not fully discharge.

72. Ms. Harper asked for the procedure to fully remove the body.

73. The doctor refused to perform the procedure, and instead gave Ms. Harper two pills to hold in her cheeks for thirty (30) minutes before swallowing them. The doctor said "the rest will come out by itself."

74. After taking the pills, but before the end of the miscarriage process, Ms. Harper was taken back to the Jail.

75. Ms. Harper's miscarriage continued for approximately one (1) week. During this week, Ms. Harper had to wear diapers due to the miscarriage and resultant heavy bleeding.

76. Ms. Harper has been in continuous mental health treatment through July 5, 2021, which was on her due date. Since then, she had requested mental healthcare, but same was not provided. Prior to July 5, therapy was helping, and after July 5, Ms. Harper lost some of the mental health progress that she had made prior to July 5.

77. Ms. Harper asked on numerous occasions for a grievance form, and was told each time that there weren't any printed.

78. Ms. Harper asked her counselor at the Jail for help in filling out a grievance. Upon information and belief, including but not limited to the counselor's statement to Ms. Harper that she was told that she could fill out a grievance on the tablet and that same was untrue and her request for a physical copy was denied, that the Jail staff made the grievance process unavailable to Ms. Harper, thereby excusing her from exhaustion requirements. See, *Hardy v. Shaikh* 959 F.3d 578 (3d. Cir. 2020).

79. These causes of action follow:

**COUNT I**

**42 U.S.C. § 1983- 5th and 14th Amendment Failure to Provide Medical Treatment**

80. All other paragraphs of this lawsuit are incorporated.

81. Ms. Harper had a serious medical need due to her pregnancy, and particularly, the special circumstances of her pregnancy discussed in ¶¶ 17-18, 20, 22-23, 26-28, 37-44, 47-51, 61-63, 65, 67-69, 71, and 73-75.

82. Defendants had specific knowledge of Ms. Harper's serious medical needs as discussed in ¶¶ 17-20, 23, 25-28, 42-46, 52-60, 63-65, and 75.

83. Defendants were deliberately indifferent to Ms. Harper's serious medical need while acting under color of state law as discussed in ¶¶ 22, 24, 25-27, 43, 46, 52-60, 64, 66-67, and 75.

84. Defendants' deliberate indifference injured Ms. Harper as discussed in ¶¶ 21-24, 26, 29-32, 37-44, 46-47, 49-51, 58-65, 67-71, and 73-76.

## COUNT II

### 42 U.S.C. § 1983- Municipal Liability for Failure to Train or Supervise

85. All other paragraphs of this lawsuit are incorporated.

86. Upon information and belief, Allegheny is aware that some inmates are pregnant in its Jail, and Allegheny expects that pregnant people will be incarcerated in its jail.

87. Upon further information and belief, Allegheny is aware that some pregnancies are "high-risk" and Allegheny expects that some pregnant people in its jail will be in the "high-risk" category.

88. Upon information and belief which cannot be substantiated without discovery, Allegheny does not provide training as to the monitoring and treatment of high-risk pregnancies, and it is therefore, inadequate.

89. Upon information and belief which cannot be substantiated without discovery, Allegheny does not monitor and/or treat high-risk pregnancies differently from regular-risk pregnancies, and is therefore inadequately supervised.

90. Allegheny's failures amount to deliberate indifference as applied to Ms. Harper, and any other person with a high-risk pregnancy, as without specialized training and/or doing more than would be done in a regular-risk pregnancy, Ms. Harper's, and any other person with a high-risk pregnancy would be in obvious risk of violation of their constitutional right to medical care as a pre-trial detainee.

91. As a direct and proximate result of Allegheny's inadequate training and/or supervision, the deliberate indifference discussed *supra* at ¶ 83 occurred and Ms. Harper's constitutional rights were injured as discussed *supra* at ¶ 84, and she is therefore entitled to damages.

WHEREFORE, the Plaintiff, Kenya Harper respectfully requests judgment in her favor, and an award of non-economic compensatory damages for pain and suffering, emotional distress, humiliation and embarrassment, and loss of enjoyment of life, as well as an award of punitive damages against individual defendants, costs of suit, pre and post judgment interest, and reasonable attorney fees.

Respectfully submitted on June 7, 2022

                        **THE TRIAL LAW FIRM, LLC**

**By:** _____
        Mart Harris, Esquire
        *Trial Lawyer for Kenya Harper*